Day, J.
 

 Upon this voluminous record, the result of a long trial, a number of grounds of error are urged in this cause, which will be discussed under various heads.
 

 First.
 
 Accommodation Paper.
 
 — It is argued that the $30,000 note was never to be paid by the Beaudette
 
 &
 
 Graham Company; that Bohn was the party primarily liable on the note; and that therefore Bohn suffered no loss, within the meaning of the policy, by the bankruptcy of the Beaudette & Graham Company.
 

 This question as to the extent of the liability of the Beaudette & Graham Company upon these notes was put squarely up to the jury in special charge No. 1, requested by the insurance company. This charge was as follows: “I charge you that if you find from all the evidence that if the notes involved were given as advance payments for washing machines which were to be manufactured and delivered by Bohn to the Beaudette & Graham Company in the future, that said note or notes were to be liquidated by the application of a $10 credit for each of the washing machines to be manufactured and sold, and if you further find that said notes were not to be paid in cash, and if you further find that it was agreed between Bohn and the Beaudette & Graham Company that said notes were to be paid in no other manner, except by the application of such credits for $10 for each machine, then you shall find for the defendant. ’ ’
 

 It is a well-known rule that this court will not weigh the evidence, but will examine the record to determine whether there is any evidence adduced in the record to sustain the verdict of the jury upon a given point.
 

 As above indicated, the paramount issue between the parties was whether or not the $30,000 note as described in Rider No. i of the policy of insurance
 
 *545
 
 was the debt of the Beaudette & Graham Company. The record shows that the Beaudette
 
 &
 
 Graham Company paid the first and second installments of interest upon this note, amounting to over $900. Letters were written by the Beaudette & Graham Company under date of September 28, 1929, wherein that company, by its president, George C. Graham, offers to make a fifty per cent, compromise to its creditors, including Bohn, and among other things says: “It is very important that this be passed on immediately to the insurance company whom we understand has guaranteed our account for $30,000, as it is essential that we get them to agree to this compromise offer, as otherwise the plan cannot go through.”
 

 A letter to the Winters National Bank & Trust Company by the Beaudette & Graham Company, by its president, George C. Graham, was written, wherein it is said: “Inasmuch as our account was insured by Mr. Bohn to the extent of $30,000.00 it seems to the writer that the thing to do is to have the insurance company get in touch with us immediately. *
 
 *< *
 
 As the writer sees it, it is the insurance company that will have to pass on this fifty per cent, offer.”
 

 The several notes were signed by the Beaudette & Graham Company, and are straight promissory notes.
 

 In addition to the above documentary items of evidence there is much testimony given by various witnesses sustaining the contention of Bohn that the Beaudette & Graham Company note was to be paid by the ten-dollar credits as washing machines were delivered during the one-year period; but that if any balance should remain unliquidated by the ten-dollar credits at the end of the year, the balance of the note was to be paid in cash.
 

 While the testimony is in conflict upon this point as to whether or not the $30,000 note was in the nature of accommodation paper, and was not to be paid in cash, but only upon application of the ten-dollar cred
 
 *546
 
 its for each machine, there is much beside the foregoing testimony referred to which would justify the jury in finding that the obligation was that of the Beaudette & Graham Company, payable in cash at the expiration of the year from its inception. We cannot concur with the contention of the insurance company that the letter of March 31,1928 (Defendant’s Exhibit 4), is conclusive on this point.
 

 Second.
 
 Nature of Coverage; Waiver and Estoppel.
 
 —It is argued that the obligation of the Beaudette & Graham Company was different from that set forth in the policy and Eider No. 1, and that therefore this obligation was not covered by the policy.
 

 The policy itself is the regular form of credit insurance policy, purporting to insure against loss arising from a proposed series of shipments of goods by a merchant to a purchaser, on account of the purchaser’s insolvency. Eider No. 1 changes the nature of the coverage very materially. The important paragraph in Eider No. 1 is heretofore set forth. By this rider it is recognized that the policy is applicable to a certain note in the amount of $30,000, theretofore delivered, for tools “purchased for the account of the debtor.” In the light of the correspondence and contracts between Bohn and Graroe, Inc., and between Bohn and the Beaudette & Graham Company, the rider is possibly not worded with precision to describe the transaction. For example, it does not appear in the rider that the tools were not purchased by the Beaudette & Graham Company and that the tools were to be the property of Graroe, Inc. The words used in the rider, however, are not necessarily inconsistent with the transaction. The tools were purchased “for the account of” the Beaudette & Graham Company in the sense that Beaudette & Graham were to pay for the tools.
 

 Moreover, it appears that all the correspondence aid contracts which gave rise to the obligation were
 
 *547
 
 turned over to the agents of the insurance company and were examined by them. No attempt was made to conceal the nature of the transaction from the company’s agents. The conclusion of the agents as drawn from the correspondence and contracts may have been erroneous, although such does not appear to have been the case, judging from the letter of November 15,1928, from the agent Stauffer to Winkler, the general agent at Cleveland, and the letter of October 23, 1928, from the agent Finucan to Winkler. The picture given to the general agent by these letters indicates a fair understanding of the transaction.
 

 Under the facts of this case, where the complete transaction was laid before the agents of the company for the purpose of enabling the proper officers of the company to pass intelligently upon the risk, the company cannot be permitted to take the position that the policy was written without knowledge of the facts. The words “estoppel” and “waiver” are used almost interchangeably by the courts in reaching such result.
 

 A waiver is effected when the officer or employe of the insurance company, having authority or discretion in the matter of the issuance of policies, issues a policy with actual knowledge of the existence of facts which would avoid it under its terms.
 

 In the instant case, the general agent Winkler, who countersigned the policy, undoubtedly had such authority, and he personally had examined the correspondence and contracts.
 

 On the other hand, even though the officer or employe authorized to issue policies does not have actual knowledge, the company may still be estopped to deny that the policy was issued with knowledge where the applicant has in good faith communicated the true facts to the soliciting agent under such circumstances that the applicant may reasonably assume that such facts will be repeated by the agent to his superiors. This is an apparent waiver or estoppel. There was
 
 *548
 
 probably a true waiver in the instant case. In any event, there was an apparent waiver which the company is estopped to deny, since the complete transaction was laid before the agents of the company.
 

 This view of the authority of the agent to bind the insurance company is not in conflict with the holding of this court in the case of
 
 John Hancock Mutual Life Ins. Co.
 
 v.
 
 Luzio,
 
 123 Ohio St., 616, wherein, at page 622, 176 N. E., 446, 449, it is said by Jones, J.: “the scope of the soliciting agent’s authority includes the duty not only of soliciting applicants for life insurance, but of reporting to his company the information acquired from applicants relating to their soundness of health.”
 

 Third.
 
 Misrepresentation and Fraud,
 
 — This defense is based upon the testimony of Tompert, president of the Winters National Bank. Tompert testified to a conversation with O’Neil, Bohn’s agent, during which O’Neil stated that the Beaudette & Graham Company’s sales had not been what they expected them to be. It is argued from this that O’Neil had knowledge of the Beaudette & Graham Company’s financial condition at the time the policy was applied for, and that therefore the negative answer to question 7 in the application was false; question 7 being as follows: “Have you any information detrimental to the credit or responsibility of the debtor?”
 

 The trial court did not regard this as sufficient evidence to warrant the jury in passing upon this question. In this we agree with the trial court.
 

 Further, the defendant in error urges that the defense of false answers in the application is not available because not pleaded, in support of which the following cases are cited:
 
 Mumaw
 
 v.
 
 Western & Southern Life Ins. Co.,
 
 97 Ohio St., 1, 119 N. E., 132;
 
 Moody
 
 v.
 
 Amazon Insurance Co.,
 
 52 Ohio St., 12, 38 N. E., 1011, 26 L. R. A., 313, 49 Am. St. Rep., 699;
 
 American Assurance Co.
 
 v.
 
 Early,
 
 23 C. C. (N. S.),
 
 *549
 
 418, 34 C. D., 320, affirmed in 91 Ohio St., 367, 110 N. E., 1053;
 
 Columbus Mutual Life Ins. Co.
 
 v.
 
 Ford, 2
 
 Ohio App., 410, petition in error dismissed, 90 Ohio St., 238, 107 N. E., 510.
 

 At the conclusion of the case an application was made to file an amended answer, presumably setting up this defense of false answers; but the case had been tried, and the court denied the application. We fail to find in the record a copy of the proposed answer, so we cannot pass upon any claimed abuse of discretion by the trial court in refusing to permit the amendment.
 

 Fourth.
 
 Modification of Contract between Bohn and the Beaudette & Graham Company.
 
 — There is no evidence of a contractual modification between these parties, no evidence of a subsequent agreement whereby the Beaudette
 
 &
 
 Graham Company was released from any of its obligations under the original contract. It is true that the schedule of washing machines to be taken each month by the Beaudette & Graham Company was never followed out. We do not find, however, any evidence that the Beaudette & Graham Company was released from its obligation to take the number of machines specified in the contract.
 

 Moreover, it appears that special instruction No. 5, requested by the insurance company, was given to the jury, as follows: “I charge you that if you should find from all the evidence that the note or notes involved herein were given by the Beaudette & Graham Company to Bohn as advanced payment on washing machines to be manufactured and delivered by Bohn to Beaudette
 
 &
 
 Graham Company in the future, and that the failure to so manufacture and deliver salable, marketable washing machines at the rate of 250 per month was the sole fault of this plaintiff, Harry Bohn, then you shall find for the defendant.”
 

 The company cannot complain of the form of its own special instruction. The jury accordingly found
 
 *550
 
 that the departure from the schedule of machines to he taken each month according to the contract was not the fault of Bohn. There was a great deal of conflicting testimony on this point, but the jury’s verdict we must take as conclusive.
 

 Fifth.
 
 Ecdstence of Dispute.
 
 — It is argued that inasmuch as the testimony showed a dispute between Bohn and the Beaudette & Graham Company as to which party was responsible for the so-called “bugs” in the machine, a term implying petty defects and minor difficulties, and the departure from the contract schedule, Bohn should have established his right against the Beaudette & Graham Company before calling upon the insurance company to pay the claim.
 

 In view of the fifty per cent, composition offered by Beaudette
 
 &
 
 Graham Company to Bohn, along with its other general creditors, it seems doubtful whether the Beaudette & Graham Company would have disputed the claim. However, assuming that a dispute existed, we refer to paragraph 7 of the policy: “Disputed accounts. — When an account is disputed in whole or in part, or where an account is in litigation, the insured shall advance and pay the expenses of any suit or action that the company may deem necessary for the purpose of endeavoring to establish'the account as a valid and legally sustainable claim against the debtor. ’ ’
 

 The company might have called upon Bohn to pay the expenses of a suit against the Beaudette & Graham Company, or for the establishment of a claim in bankruptcy. The insurance company did not elect to avail itself of this right and cannot therefore now charge Bohn with the failure to reduce his claim to judgment.
 

 Bohn claims that the expense of reducing this claim to a judgment would not have justified itself, in the light of any dividends that would have been received. However, we base our views on this point upon the
 
 *551
 
 failure of the company to take advantage of paragraph 7 of the policy.
 

 Sixth.
 
 Confusing and Irrelevant Testimony.
 
 — It is contended that the plaintiff was permitted to introduce a great mass of irrelevant testimony relating to the connection of the Winters National Bank with the transaction, the Graroe, Inc., contract, and other matters.
 

 So far as the Winters National Bank is concerned, it appears that the bank was first introduced into the case by the defendant’s second defense, as set forth in its amended answer, whereby it was claimed that the Winters National Bank was the real party in interest and the proper party to maintain this action. This defense was, however, eliminated by the court. We do not find anything objectionable, from the point of view of the insurance company, in the testimony relative to the part played by the bank in the transaction.
 

 So far as the Graroe, Inc., contract and the other correspondence, contracts and conversations surrounding the transaction are concerned, these would seem to be important as establishing and determining the nature of the obligation insured. The policy, in Rider No. 1, refers to a certain obligation. It so happens that that obligation arose out of a complicated series of letters, conversations and contracts. It was inevitable that the entire transaction should be examined and opened up, in order to establish and identify the subject matter of the insurance policy.
 

 Seventh.
 
 Settlement with
 
 Graroe,
 
 Inc.
 
 — We find no evidence in the record that this alleged Graroe settlement- ever became effective. The trial court properly instructed the jury to disregard defendant’s eighth defense, which was based upon -such a settlement.
 

 Eighth.
 
 Allowance of a Credit for the Tools and Bight of Subrogation.
 
 — It appears that Bohn is still in possession of the tools. According to the contract
 
 *552
 
 between Bohn and Graroe, Inc., the tools were to be the property of Graroe. It is argued that the insurance company should be allowed a credit for the invoiced price of the tools. The body of the policy purports to insure Bohn “against loss as herein limited and defined.” Paragraph 8 of the policy provides: “To ascertain the net loss in any adjustment under this policy, there shall be deducted from the gross loss covered and proven under this policy: * * * (2) the invoiced price of goods returned, replevined, or repossessed in any manner.”
 

 If we were dealing with a claim arising out of a shipment of washing machines from Bohn to the Beaudette & Graham Company after the policy had become effective, the situation might be different. As we have stated, however, Eider No. 1 changes the nature of the coverage materially. The policy is made to cover a $30,000 obligation theretofore incurred. It becomes in the nature of a suretyship contract rather than a policy of credit insurance. As we have heretofore stated, the agents of the company had full knowledge of the transaction. They knew that the tools were not to be shipped by Bohn to the Beaudette
 
 &
 
 Graham Company as was contemplated by the body of the policy, where it is provided: “Which loss shall consist of the unpaid purchase price of the insured’s bona fide sales of tools and equipment * * * shipped during the term beginning the fifteenth day of November, 1928, and ending the fourteenth day of November, 1929, and delivered to the debtor.”
 

 The agents of the insurance company knew that the tools were to be the property of Graroe, Inc., under the Graroe contract.
 

 The $30,000 obligation had been established before the policy was written. The insurance company knew that the tools were to remain in the possession of Bohn. If this fact gives rise to a credit against the obligation of the invoiced price of the tools, the policy
 
 *553
 
 was worthless, since the cost of the tools purchased by Bohn exceeded $30,000.
 

 To state the proposition in another way: The policy is the straight form of credit insurance, purporting to protect against loss arising from a contemplated series of sales and deliveries of merchandise by the insured to a prospective debtor. The rider, on the other hand, is in the nature of a suretyship contract, where the insurance company becomes a surety upon an existing promissory note; it being fully understood when the rider was issued that the note was not given as the consideration for the merchandise shipped or to be shipped to the debtor, but as reimbursement for the cost of tools to be used by the creditor for the debtor and that such tools were to remain in the possession of the creditor and were to belong to a third party.
 

 In view of the rider whereby the insurance company undertook to become a surety upon this $30,000 obligation, we cannot agree that Bohn’s loss, within the meaning of the policy, is to be determined by deducting the cost of the tools remaining in his possession.
 

 Whether the insurance company will be entitled to the tools upon payment of Bohn’s claim, we cannot decide in this action. It appears that according to the contract between Bohn and Graroe, Inc., the tools were to be the property of Graroe. Graroe is not a party to this suit. The insurance company’s right to the tools will depend upon the legal relation of the Beaudette & Graham Company to Graroe, Inc. If the Beaudette & Graham Company was merely a third party furnishing the consideration to Bohn for a purchase of tools for Graroe, Graroe might conceivably be entitled to the tools as against the Beaudette
 
 &
 
 Graham Company and as against the insurance company. If, on the other hand, the Beaudette & Graham Company was guaranteeing the purchase of the tools by Graroe, Graroe would be the party ultimately
 
 *554
 
 liable, and tbe insurance company through Beaudette & Graham Company would have a claim against Graroe, Inc., for reimbursement, or in default of payment for the tools.
 

 These matters cannot be determined in a suit to which Graroe, Inc., is not a party. "Whether the Beaudette & Graham Company guaranteed the Graroe account depends upon the proper construction to be placed upon the various conversations and documents involved in the transaction. As we have stated, it appears affirmatively that the agents of the insurance company were familiar with these documents.
 

 Instruction No. 7 requested by the defendant was given by the court as follows: “I charge you that if you find from all the evidence that the insured has purchased for account of Beaudette & Graham Company tools amounting to $30,000 and said Beaudette
 
 &
 
 Graham Company has given the insured its note for $30,000 in settlement therefor, and you find further that the tools were not delivered to Beaudette-Graham Company by Bohn, but were by said Bohn kept and held in his own possession as his own property, then you shall allow a credit to the defendant for the invoice price of said tools so kept by said Bohn.”
 

 Again the insurance company cannot complain of the form of its own special instruction. The jury’s verdict apparently involves a finding that the Beaudette & Graham Company was not entitled to the tools as against Bohn. This is in accordance with the Graroe contract, providing that the tools shall be the property of Graroe.
 

 Upon this long
 
 and
 
 voluminous record, with its mass of exhibits, comprised of numerous letters, contracts, documents and written instruments, we think the trial court submitted the matter to the jury with commendable care and committed no error of so serious a character as to be prejudicial to the rights of the insurance company justifying a reversal. The judgment of the
 
 *555
 
 Court of Appeals, affirming the court of common pleas, will therefore he affirmed.
 

 Judgment affirmed.
 

 Marshall, C. J., Jones, Matthias, Allen, Kinkade and Stephenson, JJ., concur.